**UNITED STATES of America, Appellee,**

v.

**David S. O'BRYANT, Defendant, Appellant.**

**No. 91–2132.**

United States Court of Appeals, First Circuit.

Heard June 10, 1993.

Decided June 29, 1993.

Frank J. McGee, for defendant, appellant.

Carole S. Schwartz, Sp. Asst. U.S. Atty., with whom A. John Pappalardo, U.S. Atty., and James B. Farmer, Asst. U.S. Atty., were on brief, for the U.S.

Before SELYA, CYR and BOUDIN, Circuit Judges.

SELYA, Circuit Judge.

This appeal raises an interesting question: Do charges brought in a superseding indictment relate back to the filing date of the original indictment for limitations purposes? In this case, where the later indictment contained charges against the defendant virtually identical to those contained in the earlier indictment, we answer the question affirmatively. And, we uphold the judgment below.

### I.

### Background

Inasmuch as the jury found the defendant guilty, we present the facts in the light most hospitable to the prosecution's case, consistent with record support.

In 1985, the Boston police department assigned defendant-appellant David S. O'Bryant, a police officer, to monitor a suspected illegal gambling operation. O'Bryant turned double agent, accepting regular payments from the bookmakers. On February 28, 1990, a federal grand jury indicted him for conspiring to obstruct law enforcement with the intent to facilitate illegal gambling activity. See 18 U.S.C. § 1511 (1988). After one of appellant's codefendants began cooperating with law enforcement authorities, the grand jury returned a superseding indictment. The superseding indictment, handed up on December 18, 1990, contained essentially the same charge against O'Bryant but revised certain language in the charges proffered against his sole remaining codefendant, Stephen Puleo.

Following a seventeen-day trial, the jury convicted both men. Subsequent to imposition of sentence, O'Bryant appealed.

### II.

### Discussion

### A.

### Statute of Limitations

Appellant's flagship claim is that, because there was no credible evidence of his participation in the conspiracy after October 1985, the statute of limitations had run by the time the superseding indictment surfaced. See 18 U.S.C. § 3282 (1988) (establishing general five-year statute of limitations for non-capital crimes).[1] The claim founders.

It is well settled that bringing an indictment tolls the statute of limitations on the charges set forth in that indictment. See United States v. Sears, Roebuck & Co., 785 F.2d 777, 778–79 (9th Cir.) (collecting cases), cert. denied, 479 U.S. 988, 107 S.Ct. 580, 93 L.Ed.2d 583 (1986); United States v. Grady, 544 F.2d 598, 601 (2d Cir.1976). Although this court has not heretofore spoken directly to the subject, we hold today that a superseding indictment which supplants a timely-filed indictment, still pending, is itself to be regarded as timely vis-a-vis a given defendant so long as it neither materially broadens nor substantially amends the charges against the defendant. Accord United States v. Lash, 937 F.2d 1077, 1081 (6th Cir.), cert. denied, —— U.S. ——, ——, 112 S.Ct. 397, 943, 116 L.Ed.2d 347, 117 L.Ed.2d 113 (1991); United States v. Pacheco, 912 F.2d 297, 305 (9th Cir.1990); United States v. Schmick, 904 F.2d 936, 940 (5th Cir.1990), cert. denied, 498 U.S. 1067, 111 S.Ct. 782, 112 L.Ed.2d 845 (1991); United States v. Italiano, 894 F.2d 1280, 1282 (11th Cir.), cert. denied, 498 U.S. 896, 111 S.Ct. 246, 112 L.Ed.2d 205 (1990); United States v. Jones, 816 F.2d 1483, 1487 (10th Cir.1987); United States v. Gengo, 808 F.2d 1, 3 (2d Cir.1986); United States v. Friedman, 649 F.2d 199, 203–04 (3d Cir.

---

1. Appellant raises this claim for the first time on appeal. We would, therefore, ordinarily review it only for plain error. See United States v. Slade, 980 F.2d 27, 30–31 (1st Cir.1993). But, because we find that the claim is unavailing as a matter of law, we forgo the extra step that plain-error review entails and proceed directly to the merits. Compare United States v. Ortiz, 966 F.2d 707, 715 (1st Cir.1992), cert. denied, —— U.S. ——, 113 S.Ct. 1005, 122 L.Ed.2d 154 (1993).

1981); *but see United States v. Peloquin*, 810 F.2d 911, 913 (9th Cir.1987). In other words, the superseding indictment relates back to the filing date of the original indictment so long as a strong chain of continuity links the earlier and later charges.

The rule which we adopt today is consistent with the general policy underlying statutes of limitations in the criminal law. The Supreme Court has described such statutes as designed "to protect individuals from having to defend themselves against charges when the basic facts may have become obscured by the passage of time and to minimize the danger of official punishment because of acts in the far-distant past." *Toussie v. United States*, 397 U.S. 112, 114–15, 90 S.Ct. 858, 860, 25 L.Ed.2d 156 (1970). That policy, in turn, is grounded in concepts of due process. A timely indictment serves notice on named defendants by apprising them "that they will be called to account for their activities and should prepare a defense." *Grady*, 544 F.2d at 601; *accord Lash*, 937 F.2d at 1082; *Schmick*, 904 F.2d at 940. When charges are brought within the limitations period and continue to pend, restatement of those charges at a subsequent date, without expanding or meaningfully altering them, does not put a defendant at an unfair disadvantage.

■ Viewed against this backdrop, appellant's claim cannot prosper. He does not gainsay either the timeliness of the original indictment or that it was still velivolant when the superseding indictment emerged. The fate of his argument, then, necessarily turns on whether the later indictment materially broadened or amended the charges limned in the earlier indictment.

A comparative analysis must start with the language and structure of the two indictments. Although the indictments featured multiple counts, appellant was charged only in the fourth count of each. We reproduce the two versions of count four in the appendix. Their similarity is readily apparent. We, therefore, embellish with a bare mini-

mum of editorial comment what is obvious from the face of the bills.

■ Just as notice-related concerns underlie the construction of statutes of limitations in the criminal law context, such concerns also comprise the touchstone for determining when a superseding indictment materially broadens or substantially amends earlier charges. *See Lash*, 937 F.2d at 1081–82; *Schmick*, 904 F.2d at 940; *Gengo*, 808 F.2d at 3. Here, the initial indictment informed appellant in no uncertain terms that he would have to account for essentially the same conduct with which he was ultimately charged in the superseding indictment. Insofar as the two versions of count four pertain to O'Bryant,[2] they each charge the same conspiracy, with the same objects, in violation of the same statute.

■ In point of fact, there are only two arguably significant differences between the indictments as they relate to appellant. First, the superseding indictment trims a year from count four's front end, pegging the onset of the charged conspiracy in 1985, not 1984. This revision reduces, rather than enlarges, the scope of the conspiracy. It is common ground—and common sense—that a limiting amendment to a charge, without some other, more deleterious modification, will not necessitate a new statute-of-limitations computation. Certainly, the narrowing that occurred here does not break the chain of continuity.

■ Second, the superseding indictment contains slightly more detail in terms of overt acts. However, none of this subsidiary detail represents a material broadening or substantial amendment of the charges already pending against appellant. For example, the original indictment alleges as an overt act that Baharoian gave a cohort, Pope, an envelope for delivery to appellant; the superseding indictment particularizes this assertion by making clear that this was a payoff, by fixing a more precise date ("August of 1985" in lieu of "1984 or 1985"), and by

2. To be sure, the neoteric version of count four charges only O'Bryant and Puleo whereas the earlier version also charged one John Baharoian. Appellant does not hypothesize that dropping Baharoian broadened or altered the charges that he faced, nor could he mount a credible argument in this regard.

fleshing out the ossature of corruption. When a superseding indictment does no more than specify the exact mechanics of a defendant's participation in a previously charged offense, it does not represent a material broadening or substantial amendment of the original indictment. *See, e.g., Lash,* 937 F.2d at 1082 (holding that, where both indictments "described the same conspiracy ... during the same time frame," the superseding indictment related back for limitations purposes despite a newly emergent "allegation of additional underlying details in [the] superseding indictment"); *Schmick,* 904 F.2d at 941 (concluding that a superseding indictment related back even though it contained "additional underlying details"); *Friedman,* 649 F.2d at 204 (similar).

We need not hammer the point. Because the only differences between the indictments as they affect appellant are differences which neither materially broaden nor substantially amend the charges against him, the superseding indictment relates back to the filing date of the original indictment for limitations purposes. Stated another way, the first indictment put appellant on fair notice anent the conduct for which he must answer and, therefore, tolled the statute of limitations for the strikingly similar charges contained in the superseding indictment. Accordingly, appellant's statute-of-limitations defense fails.[3]

### B.

### Severance

Appellant advances a second, essentially unrelated, assignment of error. He contends that the district court abused its discretion in refusing to grant his severance motion.[4] We reject this contention.

■ We start this segment of our analysis at ground zero. As a rule, persons who are indicted together should be tried together. *See Zafiro v. United States,* ⸺ U.S. ⸺, ⸺, 113 S.Ct. 933, 938, 122 L.Ed.2d 317 (1993). This practice helps both to prevent inconsistent verdicts and to conserve resources (judicial and prosecutorial). Thus, when multiple defendants are named in a single indictment, a defendant who seeks a separate trial can ordinarily succeed in obtaining one only by making a strong showing of evident prejudice. *See United States v. Martinez,* 922 F.2d 914, 922 (1st Cir.1991); *United States v. Boylan,* 898 F.2d 230, 246 (1st Cir.), *cert. denied,* 498 U.S. 849, 111 S.Ct. 139, 112 L.Ed.2d 106 (1990). The hurdle is intentionally high; recent Supreme Court precedent instructs that "a district court should grant a severance under Rule 14 only if there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence." *Zafiro,* ⸺ U.S. at ⸺, 113 S.Ct. at 938.

■ By and large, severance battles are to be won or lost in the district courts. *See Opper v. United States,* 348 U.S. 84, 94–95, 75 S.Ct. 158, 165, 99 L.Ed. 101 (1954) (explaining that Rule 14 motions are addressed primarily to the discretion of the district judge). We have stated with a regularity bordering on the echolalic that a trial judge has "considerable latitude" in deciding severance questions and that the judge's resolution of them "will be overturned only if that wide discretion is plainly abused." *United States v. Natanel,* 938 F.2d 302, 308 (1st Cir.1991), *cert. denied,* ⸺ U.S. ⸺, 112 S.Ct. 986, 117 L.Ed.2d 148 (1992). This tenet recognizes that the district court is best able to gauge matters of joinder and severance because its first-hand exposure to a case gives it a unique ability to evaluate conflicting arguments, in a zoetic context, consider

---

3. Because we rule that the superseding indictment was not time-barred even if O'Bryant's active participation in the conspiracy ended in 1985, as he claims, we do not address the government's assertion that O'Bryant's role in the conspiracy actually lasted until 1988—a time well within any conceivable period of limitations. By like token, we do not discuss the overt acts alleged to have occurred in 1988.

4. The rule authorizing motions for severance states in pertinent part:

> If it appears that a defendant ... is prejudiced by a joinder ... of defendants ... for trial together, the court may ... grant a severance of defendants, or provide whatever other relief justice requires.

Fed.R.Crim.P. 14.

all the ramifications attendant to a defense motion, and strike the delicate balance between fending off prejudice, on the one hand, and husbanding judicial resources, on the other hand. Consequently, appellate courts must exhibit a considerable measure of deference in respect to district court determinations anent severance. *See Richardson v. Marsh*, 481 U.S. 200, 209–10, 107 S.Ct. 1702, 1708–09, 95 L.Ed.2d 176 (1987); *United States v. Perkins*, 926 F.2d 1271, 1280 (1st Cir.1991).

 O'Bryant falls several leagues short of showing that the court below misused its discretion. His principal thesis—that most of the government's evidence related to Puleo and that this aggregation spilled over, thereby creating undue prejudice and warranting a retrial—is woven almost entirely from the gossamer threads of speculation and surmise. To be sure, there is some truth to appellant's plaint that a minnow (O'Bryant) and a kingfish (Puleo) stood trial together. It is also true that the prosecution drew a bead on Puleo and aimed most of its ammunition in his direction. But, these truths, without more, did not necessitate a separate trial for O'Bryant. It is well settled that, "[e]ven where large amounts of testimony are irrelevant to one defendant, or where one defendant's involvement in an overall agreement is far less than the involvement of others," the court of appeals must be "reluctant to second guess severance denials." *Boylan*, 898 F.2d at 246 (collecting cases). Such reluctance is fully justified here.

 Moreover, because the government had to show the existence of an illegal gambling business in order to convict either defendant in this case, *see United States v. Riehl*, 460 F.2d 454, 457–58 (3d Cir.1972); 18 U.S.C. § 1511, and because O'Bryant and Puleo were charged as coconspirators, virtually all the evidence relating to Puleo was also directly relevant to, and, therefore, independently admissible in, the prosecution's

case against O'Bryant. Where evidence featuring one defendant is independently admissible against a codefendant, the latter cannot convincingly complain of an improper spillover effect. *See, e.g., United States v. Figueroa*, 976 F.2d 1446, 1452 (1st Cir.1992) (collecting cases), *cert. denied,* —— U.S. ——, 113 S.Ct. 1346, 122 L.Ed.2d 728 (1993); *United States v. Sabatino*, 943 F.2d 94, 96 (1st Cir.1991); *United States v. Cresta*, 825 F.2d 538, 555 (1st Cir.1987), *cert. denied,* 486 U.S. 1042, 108 S.Ct. 2033, 100 L.Ed.2d 618 (1988).

Finally, the court below took extraordinary pains to keep the jury on the track. The court repeatedly gave limiting instructions, cabining the way in which certain pieces of evidence could be used and reminding the jurors that the evidence must be weighed separately as to each defendant on each count of the indictment. We have often alluded to the timely interposition of cautionary instructions when rejecting appeals from denials of defendants' Rule 14 motions, *see, e.g., United States v. Brennan*, 994 F.2d 918, 925 (1st Cir.1993); *United States v. Tejeda*, 974 F.2d 210, 219 (1st Cir.1992); *Natanel*, 938 F.2d at 308; *United States v. Gomez–Pabon*, 911 F.2d 847, 860 (1st Cir.1990), *cert. denied,* 498 U.S. 1074, 111 S.Ct. 801, 112 L.Ed.2d 862 (1991); *Cresta*, 825 F.2d at 555, and this case qualifies for similar treatment. The lower court's instructions were frequent, forceful, timely, and comprehensive. Appellant neither objected to them nor suggested that the court augment them. We must presume, therefore, that the jury followed the court's instructions.[5] *See Martinez*, 922 F.2d at 924; *United States v. Maguire*, 918 F.2d 254, 267 (1st Cir.1990), *cert. denied,* —— U.S. ——, 111 S.Ct. 1421, 113 L.Ed.2d 474 (1991).

We need go no further. Given the totality of the circumstances—especially the nature of the case, the imbrication of the proof, and the thoroughness of the trial court's instruc-

---

5. In this regard, we find it significant that, although the trial lasted for over three weeks, the charges were fairly simple. Rather than calling upon the jury to distinguish among numerous defendants and counts, the case involved only two defendants and four counts. This is tame stuff in contradistinction to what often confronts

a jury in a conspiracy trial. *Compare, e.g., Boylan*, 898 F.2d at 246 (upholding district court denial of motions for severance in a trial involving 7 defendants and 57 counts). The relatively straightforward structure of the case fortifies our confidence that the jurors followed the lower court's pellucid instructions.

tions—we discern no serious risk of cognizable prejudice in the sense contemplated by the *Zafiro* Court. The district court acted well within the realm of its discretion in denying appellant's Rule 14 motion.

*Affirmed.*

## APPENDIX

### *ORIGINAL INDICTMENT:*

#### COUNT FOUR

From a date in or before 1984 through a date in or about 1988, the exact dates being unknown to the Grand Jury, in the District of Massachusetts, the defendants,

> JOHN BAHAROIAN, DAVID S. O'BRYANT, and STEPHEN PULEO,

did conspire with each other, with Courtland L. Ballard, George H. Vest, and with other persons known and unknown to the Grand Jury, to obstruct enforcement of the criminal laws of the Commonwealth of Massachusetts with intent to facilitate an illegal gambling business as defined in Title 18, United States Code, Section 1511(b)(1), said JOHN BAHAROIAN and STEPHEN PULEO being at that time persons who conducted, financed, managed, supervised, directed and owned all or part of an illegal gambling business, so defined, and DAVID S. O'BRYANT, Courtland L. Ballard, and George H. Vest being Boston Police officers.

In furtherance of said conspiracy and to effect the objects thereof, the defendants JOHN BAHAROIAN, DAVID S. O'BRYANT, and STEPHEN PULEO and their co-conspirators committed the following overt acts in the District of Massachusetts:

a. In or about 1987 or 1988, STEPHEN PULEO asked Willie J. Scott whether he had taken care of the police officer yet.

b. In or about 1987 or 1988, Willie J. Scott paid DAVID S. O'BRYANT one hundred dollars ($100) in cash at or near 208–210 Woodrow Avenue in Boston.

c. In or about 1984, Robert L. Corbin, at the direction of STEPHEN PULEO, paid Boston Police Detective George H. Vest United States Currency exceeding one hundred dollars ($100) at or near 386 Warren Street in Boston.

d. In or about 1984 or 1985, JOHN BAHAROIAN gave to Robert E. Pope, an employee of the numbers betting location on Woodrow Avenue in Boston, an envelope for Pope to give to DAVID S. O'BRYANT.

e. In or about 1986, STEPHEN PULEO arranged with Boston Police Detective Courtland L. Ballard to meet at a Boston restaurant, where PULEO gave Ballard one hundred dollars.

In violation of Title 18, United States Code, Section 1511.

### *SUPERSEDING INDICTMENT:*

#### COUNT FOUR

From a date in or about 1985 through a date in or about 1988, the exact dates being unknown to the Grand Jury, in the District of Massachusetts, the defendants,

> DAVID S. O'BRYANT and STEPHEN PULEO,

did conspire with each other, and with other persons known and unknown to the Grand Jury, to obstruct enforcement of the criminal laws of the Commonwealth of Massachusetts with intent to facilitate an illegal gambling business as defined in Title 18, United States Code, Section 1511(b)(1), to wit, an illegal gambling business in violation of the laws of the Commonwealth of Massachusetts in which said business was conducted (Mass. Gen.Laws Ch. 271, §§ 7 and 17(a)), which alleged gambling business involved, during the period, five or more persons who conducted, financed, managed, supervised, directed, and owned all or part thereof and remained in substantially continuous operation in excess of thirty days and had a gross revenue of $2,000 in a single day, said STEPHEN PULEO being at that time a person who conducted, financed, managed, supervised, directed, and owned all or part of an illegal gambling business, so defined, and DAVID S. O'BRYANT being a Boston Police officer.

In furtherance of said conspiracy and to effect the objects thereof, the defendants DAVID S. O'BRYANT and STEPHEN PULEO and their co-conspirators committed the following overt acts in the District of Massachusetts:

a. In or about 1987 or 1988, STEPHEN PULEO asked Willie Scott whether he had taken care of the police officer yet.

b. In or about 1987 or 1988, Willie Scott paid DAVID S. O'BRYANT one hundred dollars ($100) in cash at or near 208–210 Woodrow Avenue in Boston.

c. In or about August of 1985, DAVID S. O'BRYANT told John Baharoian that, if Baharoian would pay him (O'BRYANT) one hundred dollars ($100) per day, he (O'BRYANT) would permit Baharoian to operate his illegal numbers gambling business at 64 Blue Hill Avenue in Roxbury while O'BRYANT had the business under surveillance.

d. In or about August of 1985, STEPHEN PULEO authorized John Baharoian to pay DAVID S. O'BRYANT one hundred dollars ($100) per day and to deduct those payments from proceeds of an illegal gambling business which Baharoian owed to PULEO.

e. In or about 1988, Alphonzo Smith paid DAVID S. O'BRYANT one hundred dollars ($100) in cash at or near 208–210 Woodrow Avenue in Boston while O'BRYANT sat in his Mercedes automobile.

In violation of Title 18, United States Code, Section 1511.